UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:07-cr-10044 |
| ) | |
| COREY L. JOHNSON, ) | |
| ) | |
| Defendant. ) | |

## ORDER

This matter is before the Court on Defendant Corey L. Johnson's Second Motion for Compassionate Release. (Dkt. 154). The Motion has been fully briefed and is ripe for review. For the following reasons, the Motion is denied.

### BACKGROUND

In July 2008, Defendant was mandatorily sentenced to life imprisonment for conspiracy to distribute more than 5 kilograms of cocaine and more than 50 grams of cocaine base in violation of 21 U.S.C. §§ 846, 841(a)(1), & 841(b)(1)(A). (Dkts. 48, 74). In June 2021, Defendant sought compassionate release, offering three primary reasons therefor: (1) his diagnosis of "polycythemia cancer;" (2) the risk of COVID-19 in light of his high blood pressure, prediabetes, and obesity; and (3) non-retroactive provisions in the First Step Act of 2018 that eliminated the mandatory life sentence for his convictions. (Dkt. 145 at 10–26). His proposed release plan indicated he would stay with his fiancée, Kiara Armstrong, a placement Probation found suitable. (Dkt. 146 at 2). In July 2021, the Court denied Defendant's Motion, concluding *inter alia*

the medical records submitted with the briefing on the motion did not support the assertion Defendant suffers from "polycythemia cancer" (*i.e.*, polycythemia vera) and instead indicated he has been diagnosed with secondary polycythemia and was largely asymptomatic.[1] (Dkt. 153 at 6–8).

Two weeks after the Court denied Defendant's Motion, he moved again for compassionate release, continuing to argue he suffers from polycythemia vera, not secondary polycythemia, and largely reiterating the same arguments set forth in the first Motion. (Dkt. 154). He also submits additional documentation including medical records and administrative complaints and resolutions. (Dkt. 160). It appears his release plan is unchanged.

Defendant remains housed at United States Penitentiary (USP) Coleman I, where there is one active COVID-19 case among the inmate population, no inmate deaths, and four active cases among staff; 106 inmates and 78 staff members were previously infected and have recovered. *COVID-19*, Fed. Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited Sept. 8, 2021).[2] COVID-19 vaccines are

---

[1] The Court also concluded Seventh Circuit precedent precluded a finding of extraordinary and compelling reasons due to (1) the fear of contracting COVID (because Defendant has been fully inoculated) and (2) the nonretroactive sentencing changes made by the First Step Act. (Dkt. 153 at 5).

[2] The Bureau of Prisons (BOP) website contains the following disclosure:
> These data are compiled from a variety of sources and reviewed by BOP Health Services staff before documented for reporting. **Not all tests are conducted by and/or reported to BOP.** The number of positive tests at a facility is not equal to the number of cases, as one person may be tested more than once. The number of tests recorded per site reflects the number of persons currently in BOP custody at the specific facility who have been tested, whether at that site or at a prior facility.

being administered at the Coleman Federal Correctional Center, which encompasses four facilities including the one at which Defendant is housed; so far, 569 staff and 4,317 inmates, including Defendant (*see* dkt. 152-3 at 16), have been fully inoculated. *COVID-19*, Fed. Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited Sept. 8, 2021).[3]

## LEGAL STANDARD

The First Step Act amended 18 U.S.C. § 3582(c)(1)(A) to allow defendants to ask the sentencing court for compassionate release. Pub. L. No. 115-391 § 603(b), 132 Stat. 5194, 5239. The decision whether to grant compassionate release is within a district judge's discretion, the standard for which is set by § 3582(c)(1)(A). *United States v. Gunn*, 980 F.3d 1178, 1180–81 (7th Cir. 2020). Under the statute, there are three requirements.

First, a defendant may not bring a compassionate release motion until either (a) the defendant has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or (b) 30 days lapse

---

*COVID-19*, Fed. Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited Sept. 8, 2021) (emphasis in original). The website further indicates there have been 993 COVID-19 tests conducted at USP Coleman I, 0 are pending, and there have been a total of 124 inmates with positive tests. *Id.*

[3] The BOP website contains the following information about vaccine data:
> The information in this area of the resource page is updated each weekday at 3:00pm EDT. It is compiled from a variety of sources and reviewed by BOP Health Services staff before documented for reporting. The locations in the table below have received allocations of the vaccine. The numbers in the table only reflect staff and inmates that are fully inoculated[.]

*COVID-19*, Fed. Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited Sept. 8, 2021).

3

"from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." § 3582(c)(1)(A). To properly exhaust, the defendant must have "present[ed] the same or similar ground for compassionate release in a request to the Bureau as in [the] motion to the court." *United States v. Williams*, 987 F.3d 700, 703 (7th Cir. 2021). This administrative exhaustion requirement, though not a jurisdictional prerequisite, is a mandatory claims-processing rule that must be enforced when properly invoked. *United States v. Sanford*, 986 F.3d 779, 782 (7th Cir. 2021).

Second, the defendant must either be at least 70 years of age and have served 30 years of the sentence for which he or she is currently imprisoned, § 3582(c)(1)(A)(ii), or demonstrate "extraordinary and compelling reasons" for release consistent with any applicable policy statement issued by the United States Sentencing Commission, § 3582(c)(1)(A)(i). The only relevant policy statement, U.S.S.G. § 1B1.13, is outdated and not currently binding on district judges, but it provides a "working definition of 'extraordinary and compelling reasons' " that can "guide [judicial] discretion without being conclusive." *Gunn*, 980 F.3d at 1180. Subsections (A)–(C) of the Application Note to § 1B1.13 enumerate three specific circumstances that qualify as "extraordinary and compelling reasons": (A) diagnosis of a terminal illness or serious condition "that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover"; (B) aging-related health decline where a defendant is over 65 years old and has served at least ten years or 75% of his

sentence; or (C) "death or incapacitation of the caregiver of the defendant's minor child" or the "incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner." Subsection (D) adds a catchall provision for "extraordinary and compelling reason[s] other than, or in combination with, the reasons described in subdivisions (A) through (C)." § 1B1.13, Application Note 1(D).

Third, the Court must consider "the factors set forth in [18 U.S.C. §] 3553(a) to the extent that they are applicable." § 3582(c)(1)(A).

## DISCUSSION

At the outset, it is worth commenting on the Government's argument that the instant Motion ought to be construed as a motion to reconsider rather than a stand-alone motion for compassionate release. On the one hand, Defendant advances virtually the same arguments in support of his release and attempts to persuade the Court its finding of fact—that Defendant has been diagnosed with secondary polycythemia, not polycythemia vera—was incorrect. This appears awfully like a motion to reconsider. On the other hand, there are no limits on the number of motions for compassionate release an individual may raise or the timing thereof (provided the request is properly exhausted).[4] So, there is no statutory reason why the Motion may not be considered as it is titled. Regardless, while the Court tends to agree with the

---

[4] Of course, such requests are matters that fall within the district court's discretion, so the district court may curb any abuse by summarily denying successive motions for compassionate release that advance arguments already considered and rejected.

5

Government on this matter, it is of little significance how the Motion is construed because either construction results in denial.

## I. Reconsideration

"Motions for reconsideration serve a limited function[:] to correct manifest errors of law or fact or to present newly discovered evidence." *Hicks v. Midwest Transit, Inc.*, 531 F.3d 467, 474 (7th Cir. 2008) (internal quotation marks omitted); *see also United States v. Rollins*, 607 F.3d 500, 502 (7th Cir. 2010) ("The Justices have concluded that motions to reconsider in criminal prosecutions are proper and will be treated just like motions in civil suits."). All the "new" evidence presented by Defendant predates the Court's Order denying his first Motion for Compassionate Release; it therefore cannot be considered "newly discovered evidence," *see Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1269 (7th Cir. 1996) ("To support a motion for reconsideration based on newly discovered evidence, the moving party must show not only that this evidence was newly discovered or unknown to it until after the hearing, but also that it could not with reasonable diligence have discovered and produced such evidence [during the pendency of the motion]." (internal quotation marks omitted and alteration in original)). Moreover, Defendant fails to demonstrate the Court's decision was based on a manifest error of law or fact for the same reasons he fails to demonstrate extraordinary and compelling reasons warranting compassionate release, as discussed below.

## II. Compassionate Release

Construing the request as a Motion for Compassionate Release necessitates discussion of several discreet issues. First up: exhaustion. The Government correctly points out the Second Motion for Compassionate Release neglects to indicate whether the request has been properly exhausted. (Dkt. 156 at 7–8). In his Reply, Defendant states he filed an administrative request for a reduction in sentence on two occasions, first in November 2020 and then again in May 2021; the first request was denied in December 2020 and the second on June 3, 2021. (Dkt. 157 at 2–3). Defendant goes on to suggest one request may be used to support his First Motion for Compassionate Release and the other may be used to support the Second Motion, thus eliminating any exhaustion issue. (Dkt. 157 at 3).

The Court disagrees. First, both requests were administratively denied *before* Defendant filed his First Motion for Compassionate Release. It boggles the mind to consider either as a predicate for the instant Motion. Why would the arguments advanced in either request—both of which were administratively denied prior to the First Motion—not be addressed in the First Motion? Was Defendant intending to file a second motion for compassionate release *before he even filed his first*? Of course not. Second, it appears the second administrative request, the denial of which is attached to Defendant's Reply as evidence of exhaustion with respect to the instant Motion (dkt. 157 at 16), sought relief because Defendant believes his sentence is too long, not because of his medical condition. (Dkt. 157 at 16). Per *Williams*, 987 F.3d at 703, this is insufficient to meet the exhaustion requirement even if we were to assume that request corresponded with the instant Motion, which it clearly does not.

7

Defendant's other argument against the Government's exhaustion defense—that the Government cites no authority that a successive motion for compassionate release must likewise be exhausted (dkt. 157 at 2–3)—is similarly unavailing. As Defendant insists he has filed a Second Motion for Compassionate Release rather than a motion for reconsideration, it defies logic to presume it need not be held to the same standard as any other motion for compassionate release. Defendant cannot have his cake and eat it too. For these reasons, the Court concludes Defendant has failed to adequately exhaust the instant Motion; it must therefore be dismissed, *see Sanford*, 986 F.3d 782.

However, even if the instant Motion had been properly exhausted, Defendant again fails to demonstrate extraordinary and compelling reasons warranting compassionate release. Defendant offers three documents supporting his position, none of which causes the Court to question its prior conclusion: the medical evidence of record indicates he has been diagnosed with secondary polycythemia rather than polycythemia vera.

First, he cites a treatment note from a BOP health services encounter stating: "[Defendant] has been recently diagnosed with polycythemia vera . . . [on] 12-18-2019. Inmate's last consultation with Hematologist 01-03-2020 recommends therapeutic phlebotomies as a treatment option." (Dkts. 154 at 4; 152-2 at 41). This document was included in the medical records considered by the Court in denying Defendant's First Motion. The Court did not give credence to this administrative note by Defendant's primary care physician, Dr. Rosario, because (1) Dr. Rosario was not the diagnosing

8

physician and (2) his treatment note is belied by the record. The December 2019[5] diagnosis by hematologist Dr. Jain was "polycythemia, likely secondary" (dkt. 152-1 at 69). Dr. Jain's diagnosis never changed during his several appointments with Defendant in the ensuing months, and while he discussed the possibility of prescribing phlebotomies as a treatment option and ordered periodic phlebotomies, he never prescribed a specific phlebotomy schedule. (Dkt. 152-1 at 69; 152-2 at 111–115). Thus, Dr. Rosario's characterization of Dr. Jain's diagnosis and treatment plan is unsupported by Dr. Jain's treatment notes, and the Court therefore disregarded Dr. Rosario's statement that Defendant had been diagnosed with polycythemia vera.

Second, Defendant cites a list of his medical conditions that was included in his inmate transfer documents which indicates a diagnosis of polycythemia vera. (Dkts. 154 at 5; 152-2 at 56). This document was also considered by the Court in resolving the First Motion. Given Dr. Rosario—the physician reporting Defendant's medical information to BOP's data system—seemed to believe Defendant had been diagnosed with polycythemia vera, it is unsurprising his BOP records should so indicate. Given the Court's conclusion Dr. Rosario was mistaken as to Defendant's diagnosis, the Court disregarded this notation in its decision.

---

[5] The treating hematologist's (Dr. Jain) treatment notes are dated December 10, 2019, not December 18, 2019. (Dkt, 152-1 at 66). The record does not contain any treatment notes or diagnosis dated December 18, 2019, so the Court presumes this date was stated in error. This assumption is supported by the fact that the fax stamp on Dr. Jain's treatment notes indicates it was faxed (likely to Dr. Rosario, who was cc'd on the treatment notes) on December 17, 2019 (dkt, 152-1 at 66), so it is possible that Dr. Rosario reviewed Dr. Jain's treatment notes on December 18.

Third, Defendant submits a new[6] medical record from Florida Cancer Specialists. (Dkt. 160 at 5–8). The report states: "[Defendant] has a known history of polycythemia vera from 9 years ago. The Patient states that until 9/2020, he had been receiving phlebotomies monthly and upon transfer, has not initiated hematologic care." (Dkt. 160 at 6). These statements are wholly unsupported by the record. Defendant was first provisionally diagnosed with polycythemia in October 2019 (dkt. 152-1 at 7), less than two years ago, and then was referred to Dr. Jain, who diagnosed "polycythemia, likely secondary" (dkt. 152-1 at 69). Additionally, while the medical records indicate Defendant received periodic phlebotomies, the record does not indicate he was ever prescribed monthly phlebotomies by Dr. Jain, his treating hematologist. It appears the physicians at Florida Cancer Specialists were operating under these false assumptions due to Defendant's own statements during the medical exam; indeed, the report goes on to state: "The patient presents to us with no medical history available." (Dkt. 160 at 6). Accordingly, the Court likewise does not view this record as evidence Defendant has been diagnosed with polycythemia vera rather than secondary polycythemia.

To summarize, the only specialist to yet diagnose Defendant diagnosed him with secondary polycythemia, not polycythemia vera. As explained, his BOP records indicate a diagnosis of polycythemia vera due to Dr. Rosario's apparent

---

[6] While "new" in the sense it was not included in the documentation provided to the Court with the briefing on the First Motion, the treatment notes are nevertheless dated prior to the Court's Order resolving that Motion. It is therefore not "new" evidence in the sense of "newly discovered evidence."

misapprehension of Dr. Jain's treatment notes. And the medical report from Florida Cancer Specialists indicates a diagnosis of polycythemia vera simply because Defendant falsely stated he was diagnosed with such nine years ago. The record contains no credible medical evidence contradicting Dr. Jain's diagnosis of secondary polycythemia. Thus, on a careful, second review of the medical evidence submitted in support of Defendant's request, the Court cannot conclude Defendant has been diagnosed with polycythemia vera. As the Court disagrees with Defendant's argument that he has been diagnosed with polycythemia vera—the primary basis for his request for compassionate release—the instant Motion must be denied for the same reasons expressed in the Order denying his First Motion. (*See* dkt. 153).

Nevertheless, a couple of Defendant's remaining arguments warrant comment. Defendant repeatedly cites *United States v. Black*, 999 F.3d 1071 (7th Cir. 2021), and in doing so, grossly mischaracterizes the Seventh Circuit's holding therein. According to Defendant, "[t]he Seventh Circuit . . . reversed a district court that failed to appreciate that a cancer diagnosis amounted to extraordinary and compelling circumstances for compassionate release." (Dkt. 154 at 6). Not so. The Seventh Circuit concluded the district court made a legal error when it treated the Sentencing Commission's policy statement on compassionate release as binding on its consideration whether extraordinary and compelling reasons existed; the Seventh Circuit did not conclude that claimant's cancer diagnosis actually constituted extraordinary and compelling reasons warranting compassionate release. *Id.* at 1074–75.

11

Additionally, Defendant repeatedly states he is immunocompromised despite there being no medical evidence in the record supporting that contention. Even if he had been diagnosed with polycythemia vera, which either is or can develop into a cancer of the blood,[7] it does not automatically follow that he would be considered immunocompromised. The CDC describes "immunocompromised state" as follows:

> Many conditions and treatments can cause a person to be immunocompromised or have a weakened immune system. Primary immunodeficiency is caused by genetic defects that can be inherited. Prolonged use of corticosteroids or other immune weakening medicines can lead to secondary or acquired immunodeficiency.

*Medical Conditions*, Ctrs. Disease Control, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Sept. 9, 2021). Defendant cites no medical authority demonstrating polycythemia, either primary or secondary, itself weakens the immune system,[8] and his medical records do not indicate he takes any immunosuppressant medicines.

And although the CDC recommends an additional dose of the COVID-19 vaccine for individuals who have been "receiving active cancer treatment for tumors or cancers of the blood," *COVID-19 Vaccines for Moderately to Severely Immunocompromised People*, Ctrs. Disease Control, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/recommendations/immuno.html

---

[7] *See Polycythaemia*, Nat. Health Serv., https://www.nhs.uk/conditions/polycythaemia/ (last visited July 29, 2021) (defining polycythemia vera as a rare genetic condition that can, in some cases, cause serious complications and/or develop into cancer); *Polycythaemia vera*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/polycythaemia-vera/symptoms-causes/syc-20355850 (last visited July 29, 2021) (describing polycythemia vera as a form of blood cancer).
[8] And the Court's research has not yielded any such authority.

#anchor_1630089738910 (last visited Sept. 9, 2021)—suggesting such individuals may be immunocompromised—Defendant does not fall into this category based on the medical records before the Court. First, he was diagnosed with secondary polycythemia, which is not cancer. Second, he has not been receiving active "cancer treatment", let alone any course of treatment that suppresses the immune system. Instead, he takes daily aspirin and his condition was closely monitored by Dr. Jain, who conducted periodic phlebotomies between December 2019 and March 2020, and is now apparently being monitored by Florida Cancer Specialists, where he has also been treated with phlebotom(ies).

For these reasons, Defendant's reliance on *United States v. Saucedo*, No. 10-30010, 2021 WL 3264410, at *1 (C.D. Ill. July 30, 2021),[9] and suggestion the Court erred in applying *United States v. Ugbah*, 4 F.4th 595, 597 (7th Cir. 2021), and *United States v. Broadfield*, 5 F.4th 801, 803 (7th Cir. 2021), is misguided. As Defendant has not demonstrated he cannot or is unlikely to benefit from his COVID-19 inoculation (because he fails to show he is immunocompromised), *Ugbah* and *Broadfield* preclude

---

[9] In *Saucedo*, the claimant was diagnosed with *inter alia* end stage renal disease and was receiving kidney dialysis three times a week, which rendered him immunocompromised; Judge Mills concluded his conditions amounted to extraordinary and compelling reasons even absent the risks attendant to COVID, *Saucedo*, 2021 WL 3264410, at *4. Defendant's situation is simply incomparable, even assuming *arguendo* he had been diagnosed with polycythemia vera; if such were the case, phlebotomies would continue to be the recommended course of treatment in addition to possible prescriptions for antihistamines (to reduce internal itch), aspirin (to reduce the risk of blood clots), and, if necessary, medication to lower the red blood cell count to normal range, *see Polycythemia vera*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/polycythemia-vera/diagnosis-treatment/drc-20355855 (last accessed Sept. 9, 2021)—none of which suppresses the immune system.

his release on the basis that his medical conditions, either separately or in combination, increase his risk of complications from COVID-19. To the extent Defendant challenges the Seventh Circuit's decisions in *Ugbah* and *Broadfield* in light of the Delta variant, this Court is powerless to make any such decision.

Finally, Defendant seems to erroneously equate the ability to administer self-care within the prison setting with the right to adequate medical care. The ability to provide self-care relates to the individual's ability to conduct daily life activities, such as ambulating, feeding, toileting, dressing, etc., without assistance. *See United States v. Hallahan*, No. 1:12-CR-10054, 2020 WL 4193112, at *3 (C.D. Ill. July 21, 2020). Defendant does not argue his medical conditions render him unable to care for himself while in prison. Rather, he challenges the adequacy of the medical care he has received while incarcerated, a claim not suited to a request for compassionate release but rather properly alleged in a civil lawsuit, *see Lockett v. Bonson*, 937 F.3d 1016, 1022 (7th Cir. 2019). Release is not the remedy where adequate medical care *can* be provided.

In summary, whether the instant Motion is construed as a motion to reconsider or a motion for compassionate release, Defendant's arguments fail. He has not offered any newly discovered evidence or demonstrated the Court's Order denying his First Motion for Compassionate Release was based on a manifest error of law or fact. Further, he has failed to exhaust the instant claim for compassionate release and to persuade he has been diagnosed with polycythemia vera, which forms the basis of his only viable argument relating to the requisite showing of extraordinary and

compelling reasons for compassionate release. For these reasons and those discussed in the Court's prior Order (dkt. 153), the instant Motion must be denied.

## CONCLUSION

IT IS THEREFORE ORDERED that Defendant's Second Motion for Compassionate Release (dkt. 154) is DENIED.

SO ORDERED.

Entered this 10th day of September 2021.

s/ Joe B. McDade
JOE BILLY McDADE
United States Senior District Judge
