IN THE
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>　　　Plaintiff,<br><br>v.<br><br>COREY L. JOHNSON,<br>　　　Defendant. | Case No. 1:07-cr-10044-JEH-1 |

**Order**

Now before the Court is Defendant Corey L. Johnson's Third Motion for Compassionate Release. (D. 174). The Motion is fully briefed and is ripe for review. For the reasons stated, *infra*, the motion is granted.[1]

**I**

**A**

Johnson was indicted on March 21, 2007, for one count of conspiring to distribute 50 grams of cocaine base (crack cocaine) and 5 kilograms of powder cocaine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A). (D. 68 at ECF p. 3). On August 28, 2007, the Government filed its notice to seek an enhancement of Johnson's sentence under 21 U.S.C. § 851 based on two prior Illinois state felony convictions. (D. 34). Specifically, in McLean County Case Number 95-CF-1165, Johnson was convicted of Criminal Drug Conspiracy, and in McLean County Case Number 99-CF-380, Johnson was convicted of Delivery of a Controlled Substance less than 15 grams of a substance containing cocaine. (D. 68 at ECF pp. 13–14). In April 2008, a jury found Johnson guilty of violating 21 U.S.C. § 846, and in July—

---

[1] Citations to the electronic docket are abbreviated as "D. ___ at ECF p. ___."

1

by operation of the then-effective language in § 841(b)(1)(A)(ii)(II)—Judge Joe B. McDade sentenced him to the mandatory minimum sentence of life imprisonment. (D. 74).

Still, Judge McDade stated that he was "not happy [about having to impose a life sentence], . . . but the point [was that he did not] have a choice. The law says someone who has two prior felony drug convictions, and they are found guilty of another drug felony must [be sentenced] to life, mandatory life." (D. 96 at ECF p. 9). Johnson appealed his conviction to the Seventh Circuit, which affirmed the court's judgment. *United States v. Johnson*, 332 F. App'x 318, 323 (7th Cir. 2009). Johnson then filed a petition for a writ of certiorari to the United States Supreme Court, which was denied on January 11, 2010. *Johnson v. United States*, 558 U.S. 1128 (2010).

In April 2021, the Bureau of Prisons ("BOP") "recategorized Johnson from a high risk to a medium risk recidivism level" (D. 176 at ECF p. 6); subsequently, in June, Johnson filed his first motion for compassionate release, offering the three following primary reasons: "(1) his diagnosis of 'polycythemia cancer;' (2) the risk of COVID-19 in light of his high blood pressure, prediabetes, and obesity; and (3) non-retroactive provisions in the First Step Act of 2018 that eliminated the mandatory life sentence for his convictions." (D. 153 at ECF p. 1). The court quickly dispelled the latter two reasons provided by Johnson, as those arguments were foreclosed by caselaw. Specifically, "prisoners who have access to a vaccine cannot use the risk of COVID-19 to obtain compassionate release." (D. 153 at ECF p. 5) (quoting *United States v. Ugbah*, 4 F.4th 595, 597 (7th Cir. 2021)). Next, the court explained that "the discretionary sentencing reduction authority conferred by § 3582(c)(1)(A) does not permit—without a district court finding some independent 'extraordinary or compelling' reason—the reduction of sentences lawfully imposed before the effective date of the First Step Act's' non-retroactive

2

changes to sentencing provisions." (D. 153 at ECF p. 5) (quoting *United States v. Thacker*, 4 F.4th 569, 575 (7th Cir. 2021)). The court, therefore, concluded that "the fact that, if sentenced today, [Johnson's] mandatory minimum would be 25 years' imprisonment rather than life imprisonment cannot constitute an extraordinary and compelling reason for compassionate release." (D. 153 at ECF p. 5). Finally, in addressing Johnson's diagnosis of polycythaemia, the court found that the medical record submitted indicated that he had been diagnosed with secondary polycythemia and was largely asymptomatic. (D. 153 at ECF pp. 7–8).

In August 2021, Johnson filed his second motion for compassionate release, which was denied for failure to exhaust administrative remedies with the BOP and for the reasons addressed in the court's first compassionate release order. (D. 162 at ECF pp. 7–14). At this juncture, it is important to note that Johnson's prior prisoner-initiated motions for compassionate release were ruled on when the "Sentencing Commission ha[d] not yet issued a policy statement 'applicable' to [his] request." *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020).

## B

After having exhausted his administrative remedies with BOP,[2] Johnson's counsel filed this Third Motion for Compassionate Release, accompanied by several exhibits. (D. 174). The Government filed its response in opposition to the Motion on December 23, 2024 (D. 176), and Johnson has replied (D. 178).

Johnson is currently assigned to Federal Correctional Institution Greenville, "a medium security correctional institution, in Greenville, Illinois." (D. 176 at ECF p. 6). Since this instant Motion, "Johnson has earned multiple hours of educational and vocational training while maintaining clear conduct." (D. 174 at ECF p. 8). For

---

[2] A federal prisoner may bring a motion for compassionate release after exhausting the administrative remedies provided by the BOP. 18 U.S.C. § 3582(c)(1)(A). The Government does not dispute that Johnson has exhausted these remedies. (D. 176 at ECF p. 6). The Court may, therefore, address the merits.

example, he has completed thirty-seven educational courses, and his last disciplinary infraction was in 2017 for exchanging money to use a phone, also known as "phone abuse" and "exchanging money for contraband." (D. 150-1). Moreover, Johnson "recently completed the BOP's 500-hour Challenge Program" and "served as a Challenge Program mentor." (D. 174 at ECF pp. 15–16).

In his instant Motion, Johnson asserts two bases for why he was eligible for a reduced sentence. First, he asserts that United States Sentencing Guidelines § 1B1.13(b)(6) provides a basis for relief and, alternatively, § 1B1.13(b)(5) allows the Court to consider whether the totality of the circumstances warrants a reduced sentence. (D. 174 at ECF p. 1). Johnson requests that his sentence be reduced to 262 months. (D. 174 at ECF p. 1). The Government, focusing solely on Johnson's § 1B1.13(b)(6) argument and the 18 U.S.C. § 3553(a) factors, argues that the circumstances cited by Johnson are not "extraordinary and compelling" reasons to reduce his sentence. (D. 176). Pointing to Johnson's extensive criminal history, which began at the age of fourteen and spans his entire life except while incarcerated, the Government also contends that Johnson's life sentence was warranted when he was sentenced in 2008 and is still warranted today. (D. 176 at ECF p. 5). Notably, Johnson has now abandoned his previous argument that his medical circumstances constituted an extraordinary and compelling reason for a sentence reduction. *See* U.S.S.G. § 1B1.13(b)(1).

## II

Generally, "a court may not modify a term of imprisonment once it has been imposed" unless "expressly permitted by statute or by Rule 35 of the Federal Rules of Criminal Procedure." 18 U.S.C. § 3582(c), (c)(1)(B). The First Step Act of 2018 is such a statute. Pub L. 115-391, 132 Stat. 5194. Before the First Step Act, only the Director of the Bureau of Prisons could move for a sentence reduction, forcing federal prisoners to "persuade and depend on" them "to bring the motion on their

behalf." *Thacker*, 4 F.4th at 572. After the 2018 amendment of § 3582(c)(1)(A), federal prisoners now have the right to request a reduction in their sentences, "provided that the prisoner first allowed the Bureau to review the request and make a recommendation (or it let 30 days pass in silence)." *Gunn*, 980 F.3d at 1179 (citing 18 U.S.C. § 3582(c)(1)(A)).

As relevant here, a court "may reduce the term of imprisonment" if it finds that "extraordinary and compelling reasons warrant such a reduction" and "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). Congress did not define "extraordinary and compelling reasons" in the statute. Instead, it delegated that task to the Commission. 28 U.S.C. § 994(t) ("The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction . . ."). The only statutory limit Congress imposed on this power is that "[r]ehabilitation of the defendant alone" may not be an extraordinary and compelling reason. *Id.* § 994(t).

"[S]hortly after the First Step Act became law, the Commission lost its quorum and with it the ability to issue a policy statement applicable to these new, prisoner-initiated motions." *United States v. Black*, 131 F.4th 542 (7th Cir. 2025). In the interim, the Seventh Circuit held that the policy statements were not binding on courts where the defendant brought the motion because the policy statements addressed only motions made by the Director of the Bureau of Prisons. *Gunn*, 980 F.3d at 1180–81. And in the absence of a binding policy statement, the Seventh Circuit held that "until the Sentencing Commission update[d] its policy statement to reflect prisoner-initiated compassionate release motions, district courts have broad discretion to determine what else may constitute 'extraordinary and compelling reasons' warranting a sentence reduction." *Thacker*, 4 F.4th at 573.

5

Years later, the Sentencing Commission regained a quorum, and effective November 1, 2023, the Commission promulgated a new policy statement applicable to compassionate release motions filed directly by prisoners. U.S. Sent'g Comm'n, Guidelines Manual § 1B1.13(a) (Nov. 2023). The Commission's 2023 amendment extended the applicability of the policy statement's categorization of "extraordinary and compelling" reasons that warrant a reduction to prisoner-filed motions, including: (1) medical circumstances of the defendant; (2) age of the defendant where the defendant is at least sixty-five years old; (3) circumstances necessitating a defendant to be a caregiver for an immediate family member; and (4) victim of abuse where the defendant has been assaulted in prison by a BOP employee. *Id.* § 1B1.13(b)(1)–(4). More pointedly, the policy statement states, in relevant part:

> **(b) Extraordinary and Compelling Reasons.**--Extraordinary and compelling reasons exist under any of the following circumstances or a combination thereof:
>
> . . . .
>
> > **(5) Other Reasons.**--The defendant presents any other circumstance or combination of circumstances that, when considered by themselves or together with any of the reasons described in paragraphs (1) through (4), are similar in gravity to those described in paragraphs (1) through (4).
> >
> > **(6) Unusually Long Sentence.**--If a defendant received an unusually long sentence and has served at least 10 years of the term of imprisonment, a change in the law (other than an amendment to the Guidelines Manual that has not been made retroactive) may be considered in determining whether the defendant presents an extraordinary and compelling reason, but only where such change would produce a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed, and after full consideration of the defendant's individualized circumstances.

6

(c) **Limitation on Changes in Law.**--Except as provided in subsection (b)(6), a change in the law (including an amendment to the Guidelines Manual that has not been made retroactive) shall not be considered for purposes of determining whether an extraordinary and compelling reason exists under this policy statement. However, if a defendant otherwise establishes that extraordinary and compelling reasons warrant a sentence reduction under this policy statement, a change in the law (including an amendment to the Guidelines Manual that has not been made retroactive) may be considered for purposes of determining the extent of any such reduction.

(d) **Rehabilitation of the Defendant.**--Pursuant to 28 U.S.C. 994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement. However, rehabilitation of the defendant while serving the sentence may be considered in combination with other circumstances in determining whether and to what extent a reduction in the defendant's term of imprisonment is warranted.

(e) **Foreseeability of Extraordinary and Compelling Reasons.**--For purposes of this policy statement, an extraordinary and compelling reason need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment. Therefore, the fact that an extraordinary and compelling reason reasonably could have been known or anticipated by the sentencing court does not preclude consideration for a reduction under this policy statement.

*Id.* § 1B1.13(b)(5)–(e).

The Seventh Circuit has described a two-step process for evaluating a prisoner-filed motion for compassionate release. First, "the prisoner must identify an 'extraordinary and compelling' reason warranting a sentence reduction." *Thacker*, 4 F.4th at 576. Second, "[u]pon a finding that the prisoner has supplied such a reason," a court "consider[s] any applicable sentencing factors in § 3553(a) as part of determining what sentencing reduction to award the prisoner." *Id.*

"[T]he movant bears the burden of establishing extraordinary and compelling reasons that warrant a sentence reduction." *United States v. Newton*, 996 F.3d 485, 488 (7th Cir. 2021) (quotation marks omitted). When determining whether a prisoner has raised an extraordinary and compelling reason, a court should consider all the reasons raised "[i]ndividually and collectively." *United States v. Vaughn*, 62 F.4th 1071, 1073 (7th Cir. 2023). Even if a reason on its own is "insufficient to meet the threshold," the collective effect of all the reasons raised may be extraordinary and compelling. *Id.*

### III

### A

Regarding Johnson's argument made pursuant to § 1B1.13(b)(6), the Seventh Circuit recently held that the Commission exceeded its authority when promulgating § 1B1.13(b)(6) to the extent that it allows a court to consider a non-retroactive change in the law as an "extraordinary and compelling reason" to reduce a sentence, either singly or in combination with other factors. *See Black*, 131 F.4th 542. Consequently, Johnson cannot succeed in arguing that his sentence warrants a reduction under § 1B1.13(b)(6), as "the amendment cannot be an extraordinary and compelling reason" because it "exceeds the scope of the Commission's explicitly delegated authority to interpret extraordinary and compelling and is invalid." *Black*, 131 F.4th 542.

### B

### 1

While any argument under § 1B1.13(b)(6) is foreclosed by *Black*, Johnson asserts that he is equally eligible for a reduction pursuant to § 1B1.13(b)(5). (D. 178 at ECF p. 12). The Commission's 2023 policy statement's Other Reasons (or "catchall") provision states that a Court may find an extraordinary and compelling reason for relief if the "defendant presents any other circumstance or combination

of circumstances that, when considered by themselves or together with any of the reasons described in paragraphs (1) through (4), are similar in gravity to those described in paragraphs (1) through (4)." U.S.S.G. § 1B1.13(b)(5). "In this context, 'gravity' ordinarily is defined as 'a serious situation or problem.'" *United States v. Moreira*, No. CR 06-20021-01-KHV, 2024 WL 378032, at *3 (D. Kan. Jan. 31, 2024) (quoting Merriam-Webster Online Dictionary).

In reviewing Johnson's submissions, it is evident that he does not fall into the circumstances described in the first four categories of the policy statement. *See* U.S.S.G. § 1B1.13(b)(1)–(4). First, as previously mentioned, Johnson has abandoned his medical circumstances argument under § 1B1.13(b)(1). Second, Johnson is currently forty-seven years old and, therefore, does not qualify as being advanced in age and having serious deterioration in health under § 1B1.13(b)(2). Third, Johnson presents no family circumstances that would require him to act as a caregiver pursuant to § 1B1.13(b)(3). Finally, Johnson does not argue that he is a victim of abuse where he has been assaulted in prison by a BOP employee, as outlined under § 1B1.13(b)(4).

The catchall provision, however, does not restrict a district court's broad discretion "to consider a wide array of extraordinary and compelling justifications for release." *United States v. Smith*, No. CR JKB-12-479, 2024 WL 733221, at *2 (D. Md. Feb. 21, 2024). In fact, when revising the provision "[t]he Commission determined that, by retaining a broad catchall provision that allows for consideration of reasons similar in gravity to those enumerated in the policy statement, courts would have both discretion and guidance necessary to grant reductions in any appropriate case."[3] As such, "the Commission continues to

---

[3] U.S. SENT'G COMM'N, 2023 AMENDMENTS IN BRIEF 3 (2023), https://www.ussc.gov/sites/default/files/pdf/amendment-process/amendments-in-brief/AIB_814.pdf [https://perma.cc/3LNQ-62WP].

believe what is stated in Application Note 4 to the current policy statement, *i.e.*, that judges are 'in a unique position to determine whether the circumstances warrant a reduction.'"[4]

Moreover, "[t]he Commission considered but specifically rejected a requirement that 'other reasons' be similar in nature and consequence to the specified reasons [in the first four subsections]."[5] In doing so, the Commission "intended to largely maintain the status quo." *Smith*, 2024 WL 733221, at *2. That is, "[g]uidance beyond that provided in the amended policy statement regarding what circumstances or combination of circumstances are sufficiently extraordinary and compelling to warrant a reduction in sentence is best provided by reviewing courts . . .".[6] Circumstances need to be similar only in "gravity (*i.e.* seriousness) to the circumstances of the first four categories even if the reason is not similar in nature and consequence to the specified circumstances in those categories." *Moreira*, 2024 WL 378032, at *3.

Here, three circumstances considered in combination with each other constitute an extraordinary and compelling reason to reduce Johnson's life sentence: (1) He would likely have received less than the mandatory life sentence imposed if he had been sentenced after *United States v. Ruth*, 966 F.3d 642 (7th Cir. 2020); (2) The sentencing disparity between him and other similarly situated defendants, and; (3) He has shown remarkable rehabilitation in prison.

---

[4] U.S. Sent'g Comm'n, Amendments to the Sentencing Guideline's 5 (2023), https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202305_RF.pdf [https://perma.cc/5R25-SGP9].

[5] *Id.* at 4–5 (citing 18 U.S.C. § 3582(c)(1)(A)).

[6] *Id.* at 5.

**2**

**a**

While *Ruth* alone cannot support a compassionate release, the fact that *Ruth* postdates Johnson's sentencing and appeal and that he would likely have received less than the mandatory life sentence imposed if he had been sentenced after *Ruth* may be considered in conjunction with the Court's additional extraordinary and compelling analysis. *See United States v. Brock*, 39 F.4th 462, 465 (7th Cir. 2022) ("Our decision in *Ruth*—even if viewed as announcing new law or a new interpretation of an existing statutory provision—cannot alone constitute an 'extraordinary and compelling' reason authorizing a reduced sentence under § 3582(c)(1)(A)."). Moreover, courts in this district have "applied the *Ruth* changes to First Step Act motions to modify a sentence." *United States v. Spates*, No. 10-30082, 2021 WL 1828110, at *4 (C.D. Ill. May 7, 2021) (collecting cases).

With that in mind, § 1B1.13(c) outlines that "a change in the law . . . shall not be considered for purposes of determining whether an extraordinary and compelling reason exists under this policy statement." *Ruth*, however, "did not establish new law." *United States v. King*, No. 13 CR 50063-1, 2024 WL 1639821, at *3 (N.D. Ill. Apr. 16, 2024). *See also United States v. Vaughn*, 62 F.4th 1071, 1072 (7th Cir. 2023) ("*Ruth* specified that its holding does not affect the career-offender calculation."). In *Ruth*, the Seventh Circuit held that the Illinois controlled substance statute, 720 ILCS § 570/401, defines cocaine more broadly than federal law. 966 F.3d at 650. In short, "the elements of an Illinois cocaine conviction do not necessarily entail the conduct identified in § 802(44) because an Illinois cocaine conviction could be based on conduct related to positional isomers of cocaine." *United States v. Simon*, No. 2:16-CR-20077-SLD, 2023 WL 2725959, at *11 (C.D. Ill. Mar. 30, 2023). Therefore, an Illinois conviction under that statute can no longer serve as a "predicate 'felony drug offense' that triggers 21 U.S.C. § 841(b)(1)(C)'s

11

sentencing enhancement." *Ruth*, 966 F.3d at 650. Because *Ruth*'s holding interpreted the Illinois statute as being broader than the federal Controlled Substances Act, the consideration of *Ruth* in the Court's § 1B1.13(b)(5) analysis does not run afoul with § 1B1.13(c). This interpretation of the Illinois statute in *Ruth* was not a "change in law" but rather a re-interpretation by the Seventh Circuit of *existing* law. *See White v. United States*, 8 F.4th 547, 556 (7th Cir. 2021).

**b**

Against that backdrop, Johnson contends that he "should never have been subject to a mandatory life sentence," as the "two Illinois convictions identified in [his] Section 851 notice should never have qualified as 'felony drug offenses' for purposes of that enhancement." (D. 174 at ECF p. 7). Specifically, as mentioned, Johnson's argument is based on *United States v. Ruth*, 966 F.3d 642 (7th Cir. 2020), which postdates his sentencing and appeal. (D. 174 at ECF pp. 7–8). Johnson contends that if he were sentenced today, he would no longer be eligible for an § 851 enhancement and receive a much lower sentence. (D. 174 at ECF p. 8). In response, the Government does not argue that *Ruth* cannot be considered in the Court's § 1B1.13(b)(5) analysis or is inapposite; rather, they assert that the Commission's interpretation of "extraordinary and compelling" in § 1B1.13(b)(6) is invalid because it is contrary to the statute's text, structure, and purpose, and the sentence Johnson received is within the range that he would be sentenced to today. (D. 176 at ECF pp. 19–21).

In one respect, the Government is correct. *Black* foreclosed any argument under § 1B1.13(b)(6), 131 F.4th at 526; and, if sentenced today, Johnson's aggravated battery offenses would now qualify as serious violent felonies and, as such, remain as appropriate predicates per § 851 even post-First Step Act of 2018 — with or without his two serious drug felony convictions. (D. 176 at ECF pp. 24–25). However, under today's sentencing scheme, Johnson's statutory mandatory

minimum is 25 year's imprisonment, not life, as even the Government acknowledges. By operation of U.S.S.G. § 5G1.1(c)(2), even as a career offender, this change in his statutory minimum penalty would change his effective guideline range from life to 360 months to life

Moreover, a mandatory life sentence is not the same as a sentence of 360 months to life. "It scarcely bears mentioning that a life sentence is the harshest punishment, short of death, that a court in this country may impose." *United States v. Savoy*, No. CR JKB-05-00415, 2024 WL 3091125, at *3 (D. Md. June 21, 2024). *See also Graham v. Fla.*, 560 U.S. 48, 69–70 (2010), *as modified* (July 6, 2010) ("[Life without parole] deprives the convict of the most basic liberties without giving hope of restoration, except perhaps by executive clemency — the remote possibility of which does not mitigate the harshness of the sentence."); *United States v. Liscano*, No. 02 CR 719-16, 2021 WL 4413320, at *4 (N.D. Ill. Sept. 27, 2021) ("A life sentence is different in kind, and not merely degree, from nearly all other sentences. It is the end of the road. There is no release date, no light at the end of the tunnel, no future to consider . . . To put it bluntly, the inmate will die in his cell. While a life sentence may be justified (or required) in certain situations, it leads to a slow, tortuous demise that makes rehabilitation and personal development immaterial."). Because the sentence Johnson received in 2008 was dictated by the statutory mandatory life sentence, pursuant to 21 U.S.C. § 841(b)(1)(A), which effectively made his guideline range life under U.S.S.G. § 5G1.1(c)(2), the sentence Johnson received is not, in fact, within the range that he would receive if he was sentenced today — 360 to life.

Next, the 2008 Presentence Investigation Report revealed that Johnson was a 30-year-old African American male with a total Offense Level of 37 after Chapter Four enhancements and a Criminal History Category of VI, which was also required by his career offender status; however, his  18 criminal history points

were sufficient for Category VI even without the career offender enhancement. His criminal history consisted of seven scorable offenses. The statutory minimum and maximum at the time, given his two prior drug convictions, was life in prison. *See* 21 U.S.C. §§ 841(b)(1)(A)(ii) (powder cocaine), and 841(b)(1)(A)(iii) (crack cocaine). Under the current interpretation of the law, per *Ruth*—as even the Government states—if Johnson were "to be resentenced under today's sentencing structure," he would face a mandatory minimum of twenty-five years, and "[t]aking [his aggravated battery offenses] into consideration, the low end of the Guidelines, 360 months, would be more appropriate . . . ." (D. 176 at ECF pp. 24–25). For that reason, to argue that Johnson's life "sentence is warranted" today, post-*Ruth*, is unavailing. (D. 176 at ECF p. 5).

The problem with equating a mandatory life sentence with a sentence of 360 months to life is that a disparity exists between his original mandatory life sentence and a sentence that can be imposed today. As already noted, with the career offender guideline in place, Johnson's guideline range was 360 months to life imprisonment in 2008, but for the statutory mandatory minimum, which effectively increased his guideline range to life, *see* U.S.S.G. § 5G1.1(c)(2); that is, the pre-*Ruth* interpretation of the two prior Illinois state felony convictions enhanced Johnson's statutory mandatory minimum sentence to life under 21 U.S.C. § 851. (*See* d. 96 at ECF p. 9) (sentencing judge stating that "the point [was that he did not] have a choice" when sentencing the mandatory life sentence); *United States v. Haynes*, No. 4:96-CR-40034, 2021 WL 406595, at *6 (C.D. Ill. Feb. 5, 2021) (McDade, J.) ("The Court . . . intends to reserve relief for cases where a previously mandatory sentence meant the sentencing judge's hands were tied."). Today, as the Government acknowledges, a similarly situated individual would have a mandatory statutory minimum of 25 years imprisonment instead of life and a guideline range of 360 months to life instead of life.

To be clear, the law has not changed; *Ruth* "did not establish new law." *United States v. King*, No. 13 CR 50063-1, 2024 WL 1639821, at *3 (N.D. Ill. Apr. 16, 2024). What has changed is that *Ruth*'s interpretation of "the relevant statutory texts" now controls. *White*, 8 F.4th at 556. Under that interpretation, if Johnson were sentenced today, he would not be subject to the same penalties under § 841, nor would he receive a statutory sentencing enhancement based on his Illinois cocaine convictions. His effective guideline range would thus also be different. *See supra*. Although the impact of *Ruth* considered in isolation may not be sufficient to establish an extraordinary and compelling reason for release, on the facts of this case, it is a factor that weighs in favor of such a finding. *See Brock*, 39 F.4th at 465.

**3**

Next, the Court considers the disparity between the sentence Johnson received and those of his co-conspirators, coupled with the 21 U.S.C. § 851 enhancement he received.

Johnson argues that his life sentence is grossly disproportionate when compared to the sentences of equally culpable defendants received in the related cases. (D. 174 at ECF p. 5). In fact, Johnson's co-conspirators all received lower sentences and are currently discharged from, or remain on, supervised release outside of BOP facilities. Specifically, Robert D. Griffin initially received a 216-month sentence (18 years), which was later reduced to 165 months (13.75 years), and "was released from custody without a referral to the Residential Re-entry Center." *See United States v. Robert D. Griffin*, No. 1:06-cr-10102-MMM (C.D. Ill. Dec. 4, 2019) (D. 50 at ECF p. 1); (*see also* Minute Entry dated September 30, 2019). Next, Ty A. Johnson initially received a 240-month sentence (20 years), which was later reduced to 120 months (10 years), and he was discharged from supervision on January 25, 2017. *See United States v. Ty Antonio Johnson*, No. 1:04-cr-10025-MMM (C.D. Ill. Jan. 25, 2017) (D. 76). Finally, Rico J. Trice, initially received a 240-

month sentence (20 years), which was later reduced to 120 months (10 years), and he was released from BOP on supervised release on March 16, 2012. *United States v. Rico J. Trice*, No. 1:03-cr-10033-JBM (C.D. Ill. Dec. 3, 2012) (D. 82 at ECF p. 1).

As discussed above, the Government concedes that if sentenced today, "without the statutory sentencing structure mandating a life sentence," Johnson's guideline imprisonment would be 360 months to life. (D. 176 at ECF p. 5 n.2). Because Johnson was the leader of the enterprise, a disparity in his and his three co-conspirators' sentences is certainly warranted. However, a life sentence—and the only one of these co-conspirators remaining incarcerated—is not warranted in these circumstances. *See United States v. Courtway*, No. 18-CR-4687-DMS-1, 2023 WL 8772931, at *8 (S.D. Cal. Dec. 19, 2023) ("[D]istrict courts are 'require[d]' to consider a defendant's sentencing disparity arguments so long as they are 'nonfrivolous.'" (quoting *Concepcion v. United States*, 597 U.S. 481, 502 (2022))). In considering the need to avoid unwarranted sentencing disparities, Johnson's sentence far exceeds the sentences that similarly situated defendants would receive today. This weighs in favor of a reduced sentence.

## 4

### a

It is no longer a secret that § 851 enhancements are applied inconsistently across judicial districts "with wide geographic variations in eligibility, filing, withdrawal, and ultimate application of the enhancement among federal drug trafficking offenders."[7] *See also United States v. Young*, 960 F. Supp. 2d 881 (N.D. Iowa 2013). These disparities, ostensible at the time of Johnson's sentencing in 2008, persist today.

---

[7] U.S. Sent'g Comm'n, Application and Impact of 21 U.S.C. § 851: Enhanced Penalties for Federal Drug Trafficking Offenders 6 (2018), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2018/20180712_851-Mand-Min.pdf [https://perma.cc/4RJ2-4PSR].

By way of background, the Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub. L. No. 91-513, 84 Stat. 1236, codified at 21 U.S.C. §§ 801–904, initially "afforded judges and prosecutors some leeway for the application of the prior drug conviction enhancement" and "replaced mandatory minimum sentences with maximum sentences for what has become 21 U.S.C. § 841." *Young*, 960 F. Supp. 2d at 886. "When it enacted § 851 in 1970, Congress" envisioned a framework created by the Department of Justice "in which federal prosecutors would carefully cull from the large number of defendants with prior drug felony convictions the hardened, professional drug traffickers who should face recidivism enhancements upon conviction." *United States v. Kupa*, 976 F. Supp. 2d 417, 419 (E.D.N.Y. 2013), *aff'd*, 616 F. App'x 33 (2d Cir. 2015). Thereafter, in rejecting maximum flexibility for judges to tailor penalties, the Fifth Circuit clarified that "it is up to the United States attorney to seek enhancement if sentence is to be enhanced," *United States v. Noland*, 495 F.2d 529, 533 (5th Cir. 1974); accordingly, the Government must satisfy the notice and procedural requirements outlined in 21 U.S.C. § 851(a)(1) before a defendant may be sentenced with an enhancement. Thus, "the Congressional motivation for the injection of prosecutorial discretion for the sentencing enhancement was to overcome the temptation for prosecutors *not* to charge offenders in situations where the court was likely to impose an unduly harsh sentence because of a qualifying prior drug offense." *Young*, 960 F. Supp. 2d at 887. Yet prosecutorial discretion has at times veered sharply from Congress's original intent, as exemplified by the Central District of Illinois, where § 851 enhancements were applied in approximately three out of five eligible cases from 2006 to 2009—a period directly relevant here, given that Johnson was sentenced in 2008. *See id.* at 909, app. E.

The Government is correct in that "non-retroactive changes to the law are not a basis for compassionate release." (D. 176 at ECF p. 21). However, that does

17

not disqualify a finding that Johnson's particular circumstances are extraordinary. In doing so, the Court notes that several other courts have factored in "what has been described as a 'stunningly arbitrary' approach in seeking § 851 enhancements" when finding that a defendant's sentence was no longer supported and the circumstances were extraordinary. *United States v. Liscano*, No. 02 CR 719-16, 2021 WL 4413320, at *5 (N.D. Ill. Sept. 27, 2021). For example, in painstaking detail, Judge Mark W. Bennett delineated the disparities in the use of 21 U.S.C. § 851 enhancements by prosecutors across the country in *United States v. Young*, 960 F. Supp. 2d 881 (N.D. Iowa 2013). Until Attorney General Holder's 2013 national policy memorandum,[8] Judge Bennett characterized the application of 851 enhancements as a "Wheel of Misfortune regime," where "[i]ndividual prosecutor's wholly-insulated § 851 charging decisions resulted in both unwarranted sentencing disparity and unwarranted sentencing uniformity—the worst case scenario imaginable." *Id.* at 890. Judge Bennett concluded with an exhortation: "[I]t is vitally important to remember that defendants subject to the § 851 enhancements are real people and members of our communities, not contestants on a game show." *Id.* at 909. Simply put, "the most important factor for the length of [defendants'] sentences should not be which prosecutor the tic, tic, tic, tic of the Wheel of Misfortune chooses for them." *Id.*

In revisiting this concept, the Court will now examine the application of § 851 enhancements—using the Sentencing Commission's 851 datafiles and caselaw—as applied in the Central District of Illinois, the Seventh Circuit, and, specifically, to Johnson. The Court will first examine data from the time of Johnson's sentencing in 2008 and then look at modern sentencing enhancement

---

[8] Memorandum from Eric H. Holder, Jr., Att'y Gen., to U.S. Att'ys and Assistant U.S. Att'ys for the Crim. Div., on the Department Policy on Charging Mandatory Minimum Sentences and Recidivist Enhancements in Certain Drug Cases (Aug. 12, 2013).

18

trends. Like all data, the following data is subject to interpretation; however, this Court interprets the data as demonstrating that at the time of Johnson's sentencing, unwarranted disparities existed in the Department of Justice's application of § 851 enhancements within the Central District of Illinois.

**b**

*1. 2008 Enhancement Data.* — The Sentencing Commission's report reveals significant variation in how § 851 enhancements were applied. The Commission's first key finding in their report was: "Cases in which an 851 enhancement applied are rare."[9] Yet from 2006 to 2009, § 851 enhancements were applied in approximately three out of five eligible cases (60.8 percent) in the Central District of Illinois. To put this into perspective, the Central District of Illinois ranked fifth in the nation in its use of § 851 enhancements.[10] While the national enhancement average rate was approximately 26.17 percent[11]—in performing a comparative analysis of the application of the enhancements across the Central, Northern, and Southern Districts of Illinois—the data shows that the Central District of Illinois has an Enhancement Rate of 78.95 percent; the Northern District of Illinois has an Enhancement Rate of 11.63 percent; and the Southern District of Illinois has an Enhancement Rate of 61.82 percent,[12] which means that the enhancement rate in

---

[9] U.S. SENT'G COMM'N, *supra* note 7, at 6.

[10] *See United States v. Young*, 960 F. Supp. 2d 881, 894 (N.D. Iowa 2013) (citing app. A, tbl.1A) (noting that the Central District of Illinois trailed only the Northern and Southern Districts of Iowa (respectively, 79% and 84%), Northern District of Florida (87%), and Guam (100%)).

[11] All statistics in this opinion are rounded up to the second decimal place. To calculate the national § 851 enhancement average, the Court added all "Enhanced" defendants (1,536) from the "Fiscal Year 2006, 2008, and 2009 Sample Groups," divided by the total "Eligible" defendants (5,870), and then multiplied by 100 to convert to a percentage: (1,536 / 5,870) x 100 = 26.17%. *See also id.* at 909, app. E., tbl.1E.

[12] To calculate the enhancement rate for the Central, Northern, and Southern Districts of Illinois, divide the number of defendants who received the § 851 enhancement by the total number of eligible defendants, then multiplied by 100 to convert to a percentage. Central District calculation: (60 / 76) x 100 = 78.95%; Northern

the Central District of Illinois is significantly higher than both its state counterparts and eighty-nine other districts nationally. This high rate makes the Central District of Illinois an outlier, suggesting a much more aggressive use of § 851 enhancements by prosecutors compared to other districts between 2006 and 2009.

Along those same lines, the range of § 851 enhancement application shows that the disparity between the highest (Central District) and the lowest (Northern District) rates within Illinois is 67.32 percent, which is significant and indicates an inconsistent application of 851 enhancements within Illinois.[13] In fact, from 2006 to 2009, an eligible defendant in the Central District of Illinois was approximately 579 percent more likely to receive an enhancement than in the Northern District of Illinois and 28 percent more likely than in the Southern District of Illinois.[14] Moreover, an eligible defendant in the Central District of Illinois was approximately 201.68 percent more likely to receive an enhancement than the national average.[15]

---

District of Illinois Calculation: (10 / 86) x 100 = 11.63%; Southern District of Illinois Calculation: (34 / 55) x 100 = 61.82%. *See id.*

[13] To calculate the disparity between the highest (Central) and the lowest (Northern) rates within Illinois, subtract the highest enhancement rate from the lowest enhancement rate: 78.95% − 11.63% = 67.32%.

[14] To calculate how much more likely a defendant in the Central District of Illinois is to receive an enhancement compared to a defendant in the Northern and Southern Districts of Illinois, the following formula is used: ((Rate in Central District / Comparison Rate) – 1) x 100 = Increased Likelihood. Specifically, to calculate how much more likely a defendant in the Central District of Illinois is to receive an enhancement compared to the Northern District of Illinois:

$$\left(\frac{78.95\%}{11.63\%} - 1\right) \times 100\% = (6.79 - 1) \times 100\% = 579\%$$

And to calculate how much more likely a defendant in the Central District of Illinois is to receive an enhancement compared to the Southern District of Illinois:

$$\left(\frac{78.95\%}{61.82\%} - 1\right) \times 100\% = (1.28 - 1) \times 100\% = 28\%$$

[15] To calculate how much more likely a defendant in the Central District of Illinois is to receive an enhancement compared to the national average, the following formula is used:

$$\text{Percentage Increase} = \left(\frac{78.95 - 26.17}{26.17}\right) \times 100 = 201.68\%$$

In the Seventh Circuit, the disparities are equally stark. Between Fiscal Years 2006 and 2009, the application rates of § 851 enhancements varied significantly across districts in the Seventh Circuit,[16] with an enhancements application average rate of approximately 18.36 percent.[17] Of the seven federal districts, two of three Illinois districts—the Central and Southern—accounted for approximately 60.65 percent of all enhancements applied in the Seventh Circuit during this period.[18]

Table 1, below, shows the total number of drug trafficking offenders against whom the government filed information pursuant to 21 U.S.C. § 851(a)(1) seeking the enhancement in each district, the total number of defendants eligible for the enhancement, the percentage of § 851 enhancement filings out of eligible cases, and the number and percentage application rate of eligible defendants who actually received a § 851 enhancement. The districts in Table 1 are organized by largest § 851 enhancement application rate to smallest, and percentages are rounded up to the second decimal place.

---

[16] Ranging from 78.95% in the Central District of Illinois to 11.63% in the Northern District of Illinois.

[17] To calculate the average application rate of § 851 enhancements for the Seventh Circuit, the following equation is used: Average = (Total Enhancements Applied / Total Eligible Cases) x 100 = (155 / 844) x 100 = 18.36%.

[18] Specifically, the Central District applied enhancements in 60 cases, and the Southern District applied them in 34 cases, for a combined total of 94 enhancements. Given that the total number of enhancements across the entire circuit was 155, the combined contribution of these two districts can be calculated as follows: (94 / 155) x 100 = 60.65%. When including the Northern District of Illinois, which applied enhancements in 10 cases, the total number of enhancements from all three Illinois districts comes to 104 out of 155, or approximately 67.1%.

**Table 1**

Section 851 Enhancement Application in the Seventh Circuit:
Fiscal Years 2006, 2008, and 2009

| District | Total Filed | Total Eligible | Percentage of § 851 Filings | Total Enhanced | § 851 Application Rate Percentage |
|---|---|---|---|---|---|
| Illinois, C | 76 | 125 | 60.80% | 60 | 78.95% |
| Illinois, S | 55 | 115 | 47.83% | 34 | 61.82% |
| Indiana, S | 50 | 115 | 43.48% | 26 | 52.00% |
| Wisconsin, E | 56 | 130 | 43.08% | 13 | 23.21% |
| Illinois, N | 86 | 204 | 42.16% | 10 | 11.63% |
| Indiana, N | 46 | 111 | 41.44% | 7 | 15.22% |
| Wisconsin, W | 20 | 44 | 45.45% | 5 | 25.00% |
| 7th Cir. Total: | 389 | 844 | 46.32% | 155 | 18.36% |

The bottom row of Table 1 summarizes the Seventh Circuit: 844 total eligible cases, 389 enhancement filings, and 155 actual enhancements applied, resulting in an overall enhancement application average rate of approximately 18.36 percent.[19] For a defendant facing sentencing in the Central District of Illinois, however, the presence of a § 851 enhancement carries not only the legal weight of a longer sentence but also the statistical reality of having been prosecuted in one of the most aggressive jurisdictions in the nation.[20] When comparing the Seventh Circuit application rate average to the Central District's 78.95 percent application rate,[21] it

[19] Further, while "[t]he average intra-circuit range for all circuits [was] 59 percentage points," the Seventh Circuit had an Intra-Circuit Disparity of 67.32%. *Young*, 960 F. Supp. 2d at 899. The national average intra-circuit range (59%) "indicates that, out of every five defendants to whom an § 851 enhancement was applied in the strictest district in that circuit, three of those defendants in the most lenient district in that circuit did not receive the enhancement." *Id.*

[20] More than three times the national average of 26.17%. For further discussion of this issue, see, for example, Alison Siegler et al., *Reforming the Federal Criminal System: Lessons from Litigation*, 25 J. GENDER RACE & JUST. 99, 137 (2022), which describes a defendant charged in the Central District of Illinois.

[21] As shown in Table 1, the Central District of Illinois had 125 eligible cases and filed § 851 enhancements in 76 of them, for a filing rate of 60.8%. Of those, 60 enhancements were actually applied, yielding an application rate of 78.95% — the highest among all seven districts.

becomes evident that prosecutors in the Central District pursued enhancements at nearly double the circuit average; likewise, prosecutors in the Central District not only filed enhancements more frequently but also followed through in applying them at a significantly higher, more punitive, rate than their counterparts elsewhere in the circuit. By contrast, despite having the largest number of defendant-eligible cases (204), the Northern District of Illinois applied enhancements in only 10 cases, yielding a markedly low application rate of 11.63 percent. This stark contrast within the same state illustrates the inconsistency in how § 851 enhancements were pursued and implemented.

While the Southern District of Illinois also recorded a high application rate of 61.82 percent—with 34 enhancements applied out of 55 eligible cases, making it the second most aggressive district in Illinois after the Central District—prosecutors in the Southern District, however, ultimately withdrew the 851 information in twenty-one cases, resulting in a withdrawal rate approximately 20 percent higher than that of the Central District. The remaining districts in Indiana and Wisconsin show moderate to low enhancement rates. For example, the Southern District of Indiana applied enhancements in 26 of 50 eligible cases, or 52 percent, while the Eastern District of Wisconsin applied them in only 13 of 56 eligible cases, or 23.21 percent—confirming that the Central District was not only an outlier within Illinois but within the entire circuit.

To further illustrate the enhancement disparity in the Seventh Circuit from the Fiscal Years of 2006, 2008, and 2009, Figure 1 below illustrates the data from Table 1.

**Figure 1**



The visual representation of the rates at which each district applied § 851 enhancements in Figure 1 makes the Central District's outlier status explicit. That is, a defendant's likelihood of receiving a sentencing enhancement in the Seventh Circuit during this period was governed less by the nature of the offense than by the geographic location in which it was prosecuted. Put differently, a defendant in the Central District was approximately 201.68 percent more likely to receive an enhancement than a similarly situated defendant elsewhere in the country. Even within the Seventh Circuit, the disparity remains extreme: the circuit-wide average enhancement rate during this period was 18.36 percent, making the Central District's use of enhancements nearly four times the average within its own appellate jurisdiction.

This means that for a defendant like Johnson, whose offense was committed in McLean County (within the Central District), the odds of facing a § 851

enhancement were not based on federal uniformity or the merits of the underlying conduct but rather on the happenstance of geography—what has been referred to as a "Wheel of Misfortune regime." *Young*, 960 F. Supp. 2d at 890. Had Johnson committed the same offense just fifty-six miles north in LaSalle County, Illinois— within the Northern District, where the enhancement rate was a mere 11.63 percent—he would have been 578 percent less likely to receive a § 851 enhancement. Even compared to the Southern District of Illinois, where the rate was 61.82 percent, the Central District still imposed enhancements 28 percent more often. Add to the mix the fact that "[w]hile 851 enhancements had a significant impact on all racial groups," Johnson statistically fared no better being an African American male, as "Black offenders were impacted most significantly."[22] These disparities illustrate a profound inequity: federal sentencing outcomes for identical conduct differed dramatically based on nothing more than the zip code in which the prosecution occurred and the race of the defendant.

In sum, both Table 1 and Figure 1 confirm that § 851 enhancements were applied unevenly and inconsistently across the Seventh Circuit during the Fiscal Years of 2006 to 2009, with the Central District of Illinois engaging in significantly harsher and extraordinarily disproportionate practices. This data from the period Johnson was sentenced contributes to the extraordinary grounds for relief.

---

[22] U.S. SENT'G COMM'N, *supra* note 7, at 7. In fact, "Black offenders were the majority (51.2%) of offenders for whom the government actually filed an information seeking the enhancement followed by White offenders (24.3%), Hispanic offenders (22.5%) and Other Race offenders (2.0%)." *Id.* at 33. "The prevalence of Black offenders was even more pronounced for offenders who remained subject to an enhanced mandatory minimum penalty at sentencing (57.9%) . . . ." *Id.*

**c**

*2. Modern Enhancement Trends.* — As U.S. Attorneys' Offices began reforming their sentencing recommendation practices nationwide,[23] the arbitrary severity of sentencing—or "Wheel of Misfortune"—only worsened for defendants in the Central District of Illinois. By Fiscal Year 2012, the Central District had the highest average sentence for drug trafficking offenders in the country, with an average prison sentence eleven years longer (160 months) than the district with the shortest average sentence (Arizona, 25 months).[24] "The data . . . suggests that the differences to some extent reveal different policies and practices with regard to charging and plea bargaining."[25]

To that end, another factor adding to Johnson's circumstances is the methods by which he received his enhancement. *See Young*, 960 F. Supp. 2d at 888 ("In many [ ] districts, the § 851 enhancements were used as a plea hammer to induce a defendant to plead—then withdrawn when the defendant did plead."). The Government maintains that "[t]o reduce [Johnson's] sentence would deprecate the seriousness of his offense and create unwanted sentencing

---

[23] *See* Eric H. Holder, Jr., Att'y Gen., Remarks at the Annual Meeting of the American Bar Association's House of Delegates (Aug. 12, 2013), https://www.justice.gov/archives/opa/speech/attorney-general-eric-holder-delivers-remarks-annual-meeting-american-bar-associations [https://perma.cc/N6JE-PRZY] ("[M]y colleagues and I are taking steps to identify and share best practices for enhancing the use of diversion programs – such as drug treatment and community service initiatives – that can serve as effective alternatives to incarceration. Our U.S. Attorneys are leading the way in this regard – working alongside the judiciary to meet safety imperatives while avoiding incarceration in certain cases."); Memorandum from Eric H. Holder, *supra* note 8. Scholars have suggested that Attorney General Holder's 2013 Memorandum, which instructed federal prosecutors to "circumvent mandatory sentences for certain drug traffickers by charging them without" considering the weight of the drugs distributed, "illustrates the importance of implementing internal administrative checks on prosecutorial discretion." R. Michael Cassidy, *(Ad)ministering Justice: A Prosecutor's Ethical Duty to Support Sentencing Reform*, 45 LOY. U. CHI. L.J. 981, 1012 (2014).

[24] *See An Offer You Can't Refuse: How U.S. Federal Prosecutors Force Drug Defendants to Plead Guilty*, HUM. RTS. WATCH, 20 (2013), https://www.hrw.org/sites/default/files/reports/us1213_ForUpload_0_0_0.pdf [https://perma.cc/HAR3-N2PB].

[25] *Id.*

disparities across the nation." (D. 176 at ECF p. 23). Yet, as the data consistently demonstrates, this claim cannot withstand scrutiny.

The Government highlights Johnson's decision not to plead guilty, noting explicitly that "Johnson could have faced less than a mandatory minimum sentence of life imprisonment, but he explicitly chose not to." (D. 176 at ECF p. 24). According to the Government, Johnson made an informed choice "to go to trial, knowing he faced a life sentence if convicted," despite receiving clear legal advice and opportunities for plea negotiations. (D. 176 at ECF p. 23). But such reasoning underscores precisely the criticism expressed in *United States v. Kupa*, that "federal prosecutors exercise their discretion by reference to a factor that passes in the night with culpability: whether the defendant pleads guilty." 976 F. Supp. 2d 417, 419–20 (E.D.N.Y. 2013) ("To coerce guilty pleas, and sometimes to coerce cooperation as well, prosecutors routinely threaten ultra-harsh, enhanced mandatory sentences that no one—not even the prosecutors themselves—thinks are appropriate. And to demonstrate to defendants generally that those threats are sincere, prosecutors insist on the imposition of the unjust punishments when the threatened defendants refuse to plead guilty.").

Further emphasizing Johnson's refusal to plead,[26] the Government notes that "it appears [Johnson] went through six attorneys before trial, and the Court recognized that all six likely advised Johnson to negotiate a plea with the Government to spare him the mandatory life sentence." (D. 176 at ECF p. 23). So, unsurprisingly, Johnson's co-conspirators, all of whom cooperated and testified in exchange for leniency, received significantly lower sentences and are either

---

[26] While the practice of prosecutors being "inclined to moderate sentencing recommendations for those defendants who plead guilty" is common in all prosecutor's offices, in the United States Attorney's Office for the Northern District of Illinois, prosecutors "moderate [their] recommendations for guilty pleading defendants, rather than enhancing our recommendations for defendants who go to trial." Dan K. Webb, & Scott F. Turow, *The Prosecutor's Function in Sentencing*, 13 LOY. U. CHI. L.J. 641, 656 (1982).

released or currently on supervised release. *See* Brief of Defendant-Appellant Corey Johnson at 8, *United States v. Johnson*, 332 F. App'x 318 (7th Cir. 2009) (No. 08-2817), 2009 WL 900100 ("Trice was later arrested and convicted of distribution of cocaine and, like Ty, testified at Johnson's trial in exchange for the possibility of a reduced sentence.").

Compounding discrepancies, however, the Sentencing Commission's 2018 report further reveals substantial disparities in prosecutors' practices surrounding the filing and subsequent withdrawal of § 851 enhancements.[27] The report describes significant nationwide variability, including a notable "interesting, but seemingly conflicting relationships" within Illinois itself.[28] Nationally, "the government ultimately withdrew the 851 information in over one-fifth (22.5%; n=170) of the 757 cases in which an 851 information was filed."[29] But "[s]everal of the districts with the highest rates of filing an 851 information also had among the lowest rates of withdrawal. For example, an 851 information was filed in [forty-four] cases (74.6 [percent] of eligible offenders) in the Central District of Illinois, with only three (6.8 [present]) withdrawn."[30] On the other hand, "the data suggests that some districts have higher rates of withdrawal even where they appear to be more selective in filing an 851 information."[31] For example, an 851 information was filed in eighteen cases (23.4 percent of eligible offenders) in the Northern District of Illinois, "which subsequently had the information withdrawn" in nine — or half (50.0 percent) — "of these cases by the time of

---

[27] U.S. SENT'G COMM'N, *supra* note 7, at 22.

[28] *Id.* at 23.

[29] *Id.* at 19.

[30] *Id.* at 23.

[31] *Id.*

sentencing."[32] The data, therefore, shows that the Central District of Illinois, which had the highest percentage of eligible drug trafficking offenders against whom the government filed an information seeking the enhancement (74.58 percent) in the nation, also had the sixth lowest rates of withdrawal (6.82 percent) in the nation. Thus, the Central District aggressively pursued enhancements while rarely rescinding them, amplifying the severity of sentencing disparities. Therefore, while the Government asserts that "Johnson . . . [explicitly chose] a mandatory minimum sentence of life imprisonment" (D. 176 at ECF p. 24), the data shows that pleading may not have changed the circumstances, as prosecutors in the Central District rarely withdrew enhancements once they had been filed.

By Fiscal Year 2016, these inequities deepened further. The 2018 Sentencing Commission report reveals that "[a]mong those who remained subject to the enhanced mandatory minimum penalty, the most common sentence imposed [nationally] was ten years of imprisonment (28.4%). Twenty offenders (8.2%) received a life sentence."[33] The Commission report also reveals that although prosecutors nationwide sought enhancements in only 12.3 percent of eligible cases,[34] the "Central District of Illinois had the highest percentage in the nation for eligible drug trafficking offenders against whom the government filed an information seeking the enhancement" at 74.58 percent.[35] Consequently, an eligible defendant in the Central District of Illinois was over five times more likely (approximately 506.34 percent) to receive an enhancement than the average

---

[32] *See id.* at 23 tbl.2, 49 tbl.A-1.

[33] *Id.* at 31.

[34] *Id.* at 36.

[35] *Id.* at 22.

defendant nationally.[36] Not surprisingly, the Central District of Illinois, at 44.2 percent, had the fourth highest proportion of the overall caseload comprising convictions of an offense carrying a mandatory minimum penalty in the nation.[37] Ultimately, 69.49 percent of eligible defendants in the Central District of Illinois received enhancements, an exceedingly punitive rate compared to its in-state counterparts—the Northern District (11.69 percent) and Southern District (8.33 percent)—demonstrating once again that sentencing outcomes in this district hinge less on the severity or culpability of offenses, and more on the arbitrary misfortune of geography.

Table 2, below, shows the total number of government-filed information's seeking the enhancement in each district, the total number of defendants eligible for the enhancement, the percentage of enhancement filings out of eligible cases, and the number and percentage application rate of eligible defendants who actually received the enhancement. The districts in Table 2 are organized by largest § 851 enhancement application rate to smallest, and percentages are rounded up to the second decimal place.

---

[36] To calculate how much more likely a defendant in the Central District of Illinois is to receive an enhancement compared to the national average in 2016, the following formula is used:

$$\text{Percentage Increase} = \left(\frac{74.58 - 12.3}{12.3}\right) \times 100 = 506.34\%$$

[37] *Quick Facts: Mandatory Minimum Penalties in the Federal Criminal Justice System*, U.S. SENT'G COMM'N (2017), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Quick_Facts_Mand_Mins_FY16.pdf [https://perma.cc/8WG4-8US4].

**Table 2**

Section 851 Enhancement Application in the Seventh Circuit:
Fiscal Year 2016

| District | Total Filed | Total Eligible | Percentage of § 851 Filings | Total Enhanced | § 851 Application Rate Percentage |
|---|---|---|---|---|---|
| Illinois, C | 44 | 59 | 74.58% | 41 | 69.49% |
| Indiana, S | 15 | 37 | 40.54% | 11 | 29.73% |
| Illinois, N | 18 | 77 | 23.38% | 9 | 11.69% |
| Indiana, N | 8 | 27 | 29.63% | 7 | 25.93% |
| Illinois, S | 6 | 60 | 10.00% | 5 | 8.33% |
| Wisconsin, W | 2 | 13 | 15.38% | 2 | 15.38% |
| Wisconsin, E | 1 | 42 | 2.38% | 1 | 2.38% |
| 7th Cir. Total: | 94 | 315 | 27.98% | 76 | 24.13% |

For a defendant sentenced in the Central District of Illinois, these data points are not merely statistics—they represent a life-altering reality. In 2016, a defendant in the Central District of Illinois was subjected to a § 851 enhancement at a rate of 69.49 percent, nearly triple the Seventh Circuit average of 24.13 percent and over five times the national average of 12.3 percent. Specifically, this means a defendant in the Central District was 506 percent more likely to receive an enhancement compared to the national average. Furthermore, the Central District not only had the highest filing rate in the nation but also one of the lowest withdrawal rates. Enhancements were filed in 74.58 percent of eligible cases yet withdrawn in only 6.8 percent of these filings. By contrast, the neighboring Northern District of Illinois withdrew enhancements in half (50 percent) of all filed cases. Additionally, the neighboring Southern District of Illinois saw an extraordinary § 851 Application Rate Percentage decrease of 53.49 percent (from 61.82 percent to 8.33 percent). This means that, unlike defendants elsewhere, Central District defendants typically saw no relief from aggressive initial prosecutorial decisions.

31

Figure 2, below, graphically highlights this disparity—illustrating how the Central District of Illinois edifices above all other districts in the Seventh Circuit in applying enhancements—making explicit the disproportionate and extraordinarily punitive prosecutorial practices.

**Figure 2**



The implications for defendants are profound. Enhancement under § 851 drastically increases the mandatory minimum sentence—often doubling penalties or, as is the case here, elevating them to life imprisonment. Thus, a defendant's geographic location in the Central District of Illinois becomes a critical determinant of their ultimate sentence, imposing a uniquely harsh prosecutorial approach that differs radically from other districts, even within the same state and circuit. In short, a defendant prosecuted in the Central District of Illinois faces penalties significantly more severe than defendants prosecuted just miles away under identical circumstances—underscoring a deeply extraordinary and compelling arbitrariness in federal sentencing practice.

This uneven application not only undercuts the principles of fairness and proportionality but also undermines the integrity of the federal sentencing system as a whole. Section 851 enhancements carry life-altering consequences, often triggering mandatory minimums and limiting judicial discretion. That such consequences are imposed so inconsistently — most severely in the Central District of Illinois — raises serious concerns about arbitrariness, prosecutorial discretion, and equal protection under the law. For any defendant sentenced in the Central District, the enhancement is not merely a statutory add-on; it is a function of a systemic disparity that magnifies punishment based not on the nature of the crime but on the culture and practices of a particular U.S. Attorney's Office.

Such arbitrary disparities challenge foundational notions of fairness and equal protection under the law, reducing justice to a game of chance. For Johnson, this injustice has translated into an unusually severe punishment compared to similarly situated defendants nationwide. This weighs in favor of a reduced sentence.

**5**

Finally, the Court considers evidence of Johnson's rehabilitation. Of course, rehabilitation alone is not enough to provide an extraordinary and compelling reason under section 3582(c)(1)(A)(i), but it is often considered alongside other factors. *See* 28 U.S.C. § 994 ("Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason."). The Court agrees that "Johnson has shown extraordinary rehabilitation and character growth." (D. 174 at ECF p. 8).

Johnson advises that he has taken substantial steps toward rehabilitation during his incarceration. (D. 174 at ECF pp. 15–17). Although Johnson had two serious disciplinary infractions since beginning his sentence in 2008, he has not had a single disciplinary write-up since 2017. (D. 150-1). Johnson has completed

33

thirty-seven educational courses; moreover, he "recently completed the BOP's 500-hour Challenge Program" and "served as a Challenge Program mentor." (D. 174 at ECF pp. 15–16). As a member of the program, Johnson was in treatment for twenty-four hours a day, seven days a week, for roughly twenty-one days. "The primary goal of the Challenge Program is making a transition from former criminal lifestyles to a new and honorable (positive) way of living." (D. 174 at ECF p. 15) (internal quotation marks and citation omitted). Johnson's "concerted efforts to grow as a person despite the hardships of incarceration weigh strongly in favor of compassionate release." *United States v. Santamaria*, 516 F. Supp. 3d 832, 838 (S.D. Iowa 2021) ("Defendant completed drug treatment and the BOP's 'Challenge Program,' earned his GED in 2009, served as a suicide companion and an ESL tutor, worked throughout his incarceration, and completed numerous education programs.").

The Court also notes the many letters of support and admiration written by Johnson's friends and family. In total, eleven individuals have submitted letters on behalf of Johnson to attest to his positive transformation in prison. (D. 174-3 at ECF p. 2) (letter from Mr. Jackson, who is an owner of a trucking company, wrote the Court to support Johnson and said, "upon [Johnson's] release back into society, [his] . . . company will pay for [Johnson] to obtain his CDL (Commercial Driver's License)"); (D. 174-3 at ECF p. 3) (Johnson's daughter explaining that "[e]ven though he couldn't be there physically in my life for 17 years," "my dad has been the most supportive person . . . and has become my best friend"); (D. 174-3 at ECF p. 12) (letter from a Deacon of a church, stating that Johnson "has made strides to become a better person while in prison"). This public support weighs in Johnson's favor.

In sum, in this case the totality of the unique circumstances considered in combination with one another as discussed, *supra*, constitute extraordinary

compelling reasons to reduce Johnson's life sentence within the meaning of § 3582(c)(1)(A) and § 1B1.13(b)(5). Therefore, the Court must next determine whether a reduction is warranted and the extent of any reduction, under the applicable factors set forth in 18 U.S.C. § 3553(a). *See* 18 U.S.C. § 3582(c)(1)(A).

**IV**

The Court turns next to whether a sentence reduction is consistent with the sentencing factors outlined in 18 U.S.C. § 3553(a) "to the extent that they are applicable." 18 U.S.C. § 3582(c)(1)(A). The relevant factors applicable here include: the nature and circumstances of the offense, Johnson's personal history and characteristics, the purposes of sentencing, including the need to protect the public from further crimes, any threat to public safety, and the need to avoid unwanted sentence disparities among defendants with similar records who are convicted of similar conduct. *See* 18 U.S.C. § 3553(a). "The list of factors is preceded by what is known as the parsimony principle, a broad command that instructs courts to 'impose a sentence sufficient, but not greater than necessary, to comply with' the four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation." *Dean v. United States*, 581 U.S. 62, 67 (2017) (quoting 18 U.S.C. § 3553(a)). Johnson asks for a sentence of 262 months. (D. 174 at ECF p. 1). The Government argues that Johnson "is not entitled to any relief." (D. 176 at ECF p. 19). The Court will address each factor in turn.

Beginning with the Sentencing Guidelines, as discussed, *supra,* and as the parties agree, under today's Guidelines, Johnson would have a guideline range of 360 to life and a statutory mandatory minimum of 25 years, given that his two aggravated battery offenses would qualify as serious violent felonies, with or without his two prior serious drug felonies. The dramatically shorter guidelines range today from his original effective guideline range of life is a reason to conclude that a life sentence is excessive.

35

Next, the Court turns to the nature and circumstances of the offense. Undoubtedly, conspiring to distribute controlled substances is a serious offense. Johnson "chose to break the law in a big way," as an affiliate of the Gangster Disciples street gang, he led a "conspiracy lasting nearly five years and involving over 700 grams of crack cocaine and 8.5 kilos of powder cocaine." (D. 176 at ECF p. 22). The Government focuses heavily, if not exclusively, on Johnson's offensive conduct. (D. 176 at ECF pp. 22–25). Johnson, however, does not dispute that his offense conduct was serious. (D. 178 at ECF p. 15) ("Johnson has shown genuine remorse for his actions and a sincere commitment to change."). Highly relevant here, however, is that "evidence of post-sentencing rehabilitation may plainly be relevant to 'the history and characteristics of the defendant.'" *Pepper v. United States*, 562 U.S. 476, 491 (2011) (quoting 18 U.S.C. § 3553(a)(1)). As discussed, Johnson has completed thirty-seven educational courses, "including the most prestigious courses the BOP offers." (D. 177 at ECF p. 15). In doing so, Johnson became "a trusted and well-respected inmate who serve[d] as both a teacher and mentor to fellow prisoners," which has allowed him to earn a "lower placement classification by the BOP based on his behavior and performance in prison." (D. 177 at ECF p. 15). Indeed, Johnson's record in prison is not perfect, but no court expects perfection, as perfection in BOP is often unattainable. Moreover, the disciplinary records provided by the Government show that Johnson's last serious infraction occurred almost a decade ago, on June 30, 2015. (D. 150-1).

For numerous reasons, this case is tragic; for example, the events leading up to today began when Johnson was fourteen when his criminal history started "with a firearm offense and continued until his incarceration." (D. 176 at ECF p. 22). "It would have been entirely rational for [Johnson] slated to die in prison to take no steps to improve himself for post-release adjustment. Many would simply say, 'what's the point?'" *Liscano*, 2021 WL 4413320, at *9. Johnson, however, did

36

not give up hope and has shown extraordinary rehabilitation and growth. Furthermore, in support of his Motion, Johnson points out that "the national average sentence for murder was 281 months (approximately 23 years)." (D. 174 at ECF p. 18). While Johnson's aggravating circumstances warrant a substantial sentence, as discussed in detail above, this "Court doubts any reasonable person would suggest they are deserving of a sentence 5 times the length of the average sentence for murder." *Haynes*, 2021 WL 406595, at *6. Johnson's "case is one illustrating how severe sentencing mandates can create outcomes wholly divorced from our notions of justice." *Id.* That said, a life sentence is out of step with the severity of the conduct.

Next, the Court considers the history and characteristics of the defendant. Here, at the age of fourteen, Johnson discharged a firearm in the direction of an individual, and at the age of eighteen, he assaulted a peace officer and then, subsequently, a correctional officer. The Court notes Johnson's youth during these acts of violence; moreover, his additional history mostly consisted of nonviolent drug offenses, somewhat mitigating its severity. Moreover, as the Court has discussed above, Johnson's history and characteristics in the years since his sentencing are markedly more positive. He has committed no acts of violence, has undertaken additional educational programming, and has mentored his fellow inmates. This evidence of rehabilitation weighs in favor of a lighter sentence than would otherwise be imposed. *See Pepper*, 562 U.S. at 491 ("[E]vidence of postsentencing rehabilitation may be highly relevant to several of the § 3553(a) factors that Congress has expressly instructed district courts to consider at sentencing.").

The sentencing factors needed for the sentence imposed are as follows: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to

criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2)(A)–(D). A lengthy sentence is needed to satisfy these subfactors. The Court, however, concludes that a life sentence is excessive based on the facts of this case and the data discussed above.

The Court also considers Johnson's age. Johnson has already served nearly eighteen years in prison. He is now forty-seven years old, and, assuming he qualifies for all available good-time credits, Johnson will likely be in his mid-fifties by the time he completes the 360-month sentence the Court will impose. Recidivism after age fifty is considerably less probable, and courts account for this fact when weighing whether a sentence reduction is suitable. *See United States v. Payton*, 754 F.3d 375, 378 (6th Cir. 2014) ("The Sentencing Commission has observed that [r]ecidivism rates decline relatively consistently as age increases." (internal quotation marks and citation omitted)). Additionally, the Court also considers Johnson's proposed release plan. Johnson plans to live with his wife, Ms. Armstrong. Without making a recommendation, the U.S. Probation Office has determined that Johnson's plan to reside with Ms. Armstrong is suitable. (D. 155). Moreover, "[t]he Government has no doubts that Ms. Armstrong would support Johnson to the best of her ability," and "no doubt that he has loved ones and family members that would like to see him out of prison" and would be willing to help him succeed. (D. 176 at ECF p. 24). *See also* (D. 174-3 at ECF p. 2) (letter from Mr. Jackson, who wrote to support Johnson by stating that his company "will pay for [Johnson] to obtain his CDL").

Next, the Court considers the need to avoid unwarranted sentencing disparities. As the Court has already noted, Johnson's sentence far exceeds the sentence that similarly situated defendants would receive today and, at the time

38

he was sentenced, almost everywhere else in the country. Indeed, his sentence far exceeds that even of defendants convicted of more serious crimes than his. This militates in favor of a reduced sentence.

## V

Considering all these factors discussed, *supra*, and having reviewed the record in full, the Court concludes that the sentence that is sufficient but not greater than necessary to fulfill the statutory purposes of punishment is a term of 360 months in prison. This sentence of imprisonment, along with all other previously imposed aspects of Johnson's sentence, will reflect the seriousness of the offense, promote respect for the law, and provide just punishment; will afford adequate deterrence to criminal conduct; and will "protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2).

The Clerk of Court is directed to prepare an Amended Judgment for entry, reducing Johnson's sentence to 360 months of imprisonment and keeping all other aspects of the judgment of the same.

*It is so ordered.*

Entered on April 11, 2025

s/Jonathan E. Hawley
U.S. DISTRICT JUDGE

39